UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| **CRYSTAL A. ANDERSON** | **CIVIL ACTION** |
| **VERSUS** | **JUDGE** |
| **STATE OF LOUISIANA, DEPT. OF TRANSPORTATION & DEVELOPMENT** | **MAGISTRATE JUDGE** |

## COMPLAINT WITH JURY TRIAL DEMAND

### JURISDICTION AND INTRODUCTION

1.

This is a Civil Action for damages pursuant to 42 U.S.C. 2000e, et seq. For being subjected to a hostile work environment because of her race (African-American) and finally termination in retaliation for having filed a complaint for racial and gender discrimination. Jurisdiction is funded upon 28 U.S.C. 1343. Plaintiff filed an EEOC Charge ( No. 461201601284) on June 4, 2016, and received a right to sue letter dated August 31, 2017, on September 11, 2017. Plaintiff demands trial by jury.

### PARTIES

2.

Plaintiff is an African American female and a major domiciled in Shreveport, Caddo Parish, Louisiana.

3.

Defendant is the State of Louisiana, Department of Transportation & Development. Defendant is a business within the meaning of Title VII and as such is prohibited from discriminating in employment decisions on the basis of gender or race and may not retaliate against any employee who has opposed practices made unlawful by the statue.

**FACTS**

4.

At all times relevant and pertinent herein, Plaintiff was an employee of the Louisiana Department of Transportation and Development having been hired on September 24, 2012, as a laborer working on a "bridge crew" – ME O1.  She was terminated from her job as a member of the "bridge crew" on May 17, 2016.

5.

The "bridge crew" to which plaintiff was assigned consisted of eight members.  At various times plaintiffs crew worked with less than the full eight person contingency.  There were multiple crews which were tasked with the jobs of repairing damaged portions of the bridge or the roadway or the shoulders in the areas near the bridges.  The plaintiff's crew was assigned to the area of Northwest Louisiana.

6.

Plaintiff was the only female and one of a very few African-Americans who worked on a DOTD "bridge crew" in this area.  She asked for no favors in assignments and she held her own with the male members of her crew.  Her days were spent using a jackhammer, working on "mud jacking" projects, filling pot holes on bridges,  cleaning debris from around the bridge structures,

and driving from bridge to bridge which often took up multiple hours each day.  Her co-workers treated her well and she considered them work friends.

7.

The DOTD "bridge crews" worked four-days a week – Monday through Thursday, putting in ten hours a day.  On occasion they were assigned mandatory work days when there were problems which could not wait until the following Monday.  There were times when crews were offered to work extra hours on their regular days off.

8.

The work of the "bridge crews" was exhausting.  It obviously was outdoor work and it took place in the worst heat of the summer and the coldest, nastiest days of the winter.

9.

Dennis Rushing was the plaintiff's immediate supervisor.  He was the "boss" on that particular "bridge crew."  It was only Dennis Rushing who created an unpleasant and eventually a hostile work environment for plaintiff, and it was Dennis Rushing who prevailed upon his supervisors to terminate plaintiff from her employment with the DOTD.

10.

Dennis Rushing was considered a difficult and unpleasant "boss" by most of the members of his crew.  Lacking in professionalism, he discussed his personal dislike for and opinions of his various crew members when they were not present.

11.

Dennis Rushing would frequently order his crew to work on weekends when there was no necessity to do so, but because he merely wanted to earn extra hours.  Plaintiff learned this only shortly before her departure from the DOTD.  It was on one of those weekends that her crew was

working along with another crew.  The members of the other crew assumed, that like themselves, plaintiff and her co-workers had requested the extra hours.  In fact, most of plaintiff's crew members seldom chose to work beyond their 40 hour work week.

12.

Plaintiff is a diabetic and also suffers from high blood pressure.  Her condition requires her to keep regular appointments with her primary care physician in order to regulate her medications.  Her condition has never impaired her ability to perform her job and she never asked for special consideration.

13.

The 4-day, 40-hour a week schedule worked perfectly for plaintiff.  It allowed her to schedule any medical appointments or any other appointments on a Friday.  She would be able to make appointments weeks ahead.

14.

It was this situation which became problematic for plaintiff during mid-March 2016. Plaintiff had scheduled an appointment with her primary care physician for Friday, March 11th. Without any advance notice, Dennis Rushing announced on Thursday that the crew would be working a mandatory extra shift that weekend.  Plaintiff dutifully called and cancelled her doctor's appointment, re-scheduling it for the following Friday, March 18th.

15.

The following Thursday,  Dennis Rushing once again issued a mandatory extra shift over the weekend for his crew.   Plaintiff told him she could not keep cancelling appointments with her doctor just because he decided to work his crew extra hours.  Reluctantly he agreed she should keep her doctor's appointment.  Later that night, she received a telephone call from Mr.

Rushing during which she was directed to bring a "doctor's slip" to the office when she returned to work the following Monday.

16.

As it turned out another member of the plaintiff's "bridge crew" also needed to be off that Friday. He was a white male. Plaintiff called him, John Tuggle, Jr., and asked him if he was ordered to bring a doctor's slip to work on Monday. He told her the appointment wasn't even for himself. He needed to take his girlfriend to a doctor's appointment. He was not ordered to bring any doctor's notice in to work when he returned the following Monday.

17.

The same evening she had received Mr. Rushing's call, and that she called her co-worker, John Tuggle, Jr., plaintiff decided to call Dennis Rushing's supervisor, Joshua Bedgood. She wanted to know why she should have to provide a doctor's slip and her white, male co-worker did not. Mr. Bedgood could provide no satisfactory answer and told plaintiff that he would discuss the matter with Mr. Rushing the following Monday. On Saturday, March 19th, Dennis Rushing called plaintiff and once again reminded her she must bring a doctor's slip to work with her the following Monday, March 21st.

18.

On Monday, March 21st, plaintiff gave Mr. Rushing her doctor's excuse. Mr. Bedgood apparently called Mr. Rushing in to his office to discuss the matter. Later that day plaintiff was called back in to Mr. Rushing's office. He explained to me that the reason why I needed a doctor's excuse and Mr. Tuggle did not, was due to the fact that I actually saw a doctor. On the other hand, Mr. Tuggle was merely providing transportation for his girlfriend.

Case 5:17-cv-01597-EEF-KDM   Document 1   Filed 12/09/17   Page 6 of 11 PageID #:  6

19.

The Spring of 2016 became more stressful for me as it became clear that Dennis Rushing wanted me gone from the DOTD.  Mr. John Tuggle, Sr. (one of my co-workers, along with his son John Tuggle, Jr.)  asked me several times what I had done to make Mr. Rushing so angry with me.   Mr. Tuggle told me he had been told by Mr. Rushing that "I want Crystal Anderson's ass out of here."

20.

There had been another African-American (Mr. Milton Bonaparte) on the crew some time earlier.  Co-workers told me Dennis Rushing had told them (out of our presence) that he would not work an extra shift if that gentleman and I were both  on site at the same time.

21.

On another occasion John Tuggle, Sr. told me that Dennis Rushing had told him that he "hoped Anderson would use all of her time, then when she asked for more time off, he would have an excuse for firing her."

22.

There was another employee that Dennis Rushing also "wanted gone" – James Byson. Mr. Byson had been with the DOTD for 26 years.  He had been involved in a vehicular accident about six months before I was terminated.  For the last six months of my time with DOTD, I was assigned to ride in the same truck as Mr. Byson.  He was not permitted to drive, which meant I had to do all of the driving throughout our ten-hour shift.  It was a given, that because much of our day was spent driving from site to site, the workers would rotate the driving duties.  We drove large, cumbersome vehicles and it was much more pleasant to merely be a passenger.

23.

Not only was I assigned to drive exclusively with Mr. Byson, we were also relegated to driving the one truck that had no functioning air conditioning. When Milton Bonaparte was still working on the crew, he and I were the ones who got the truck with no air conditioning. By the spring of 2016 Mr. Bonaparte had retired due to heart problems.

24.

At all times during my employment with DOTD, my performance evaluations were fine. I had received no discipline or negative reports.

25.

My termination was eventually based on a pretextual explanation that I had "stolen time" from my employer on May 12, 2016. The entire crew had been working on two projects the day before. It seemed to Dennis Rushing that it appeared there were too many workers on site who were merely standing around doing nothing.

26.

On May 12th Dennis Rushing directed plaintiff and James Byson to take their truck, mix some concrete and then patch up a bridge which was about a twenty minute drive from where the rest of the crew was working. He told us to "take your time, ride around, I will call you when I need you."

27.

Mr. Byson and plaintiff did as directed. It got to be lunchtime and so I drove to the Lake Ivan area where we planned to eat lunch. Shortly after arriving I got a call from Dennis Rushing on my cell phone. He asked where we were and I told him. He said, "Finish your lunch and then meet us back at the bridge in Minden. Two minutes later, we got a call from Dennis Rushing on

the radio.  He asked where we were and stated they were waiting for us at the bridge in Minden. Then almost immediately after that call, James Byson got a call from Dennis Rushing on his cell phone.  Rushing asked him the same question he had asked me several minutes before when he called my cell phone. We headed back to the bridge in Minden without eating our lunch.

28.

Upon arriving at the work site in Minden, James Byson got out of the truck and spoke with Dennis rushing.  He came back and told me we were going to be written up.  No reason was given for the write-up.   We all headed back to our base in Bossier City.  On the way back we received a call on our radio from Dennis Rushing.  He told us to go back to the work site in Minden and pick up the road signs.  We advised we had already done so.  He directed us to return to the Bossier yard.

29

When we got to the yard, the rest of the crew was gone for lunch. Mr. Rushing called us to his office.  He said, "Did you all enjoy riding around while the rest of us were out there working?"  I reminded him that he had told us to go out and take our time to do a small job and that he would call us when we were needed.

30.

Mr. Rushing responded, "So you don't think you all need a write-up?"  I replied, "No, but if you do, when you're finished writing, I will be standing right outside to write what I think." He did not write us up.

31.

On Monday, May 16, 2016, we had a normal workday. Nothing unusual took place. However, on Tuesday, May 17th, Mr. Byson and I were called in to the office–first Mr. Byson who was in there for about 45 minutes. He disappeared. Then I was called.

32.

When I was called in Mr. Rushing was there along with his supervisors Joshua Bedgood and John Rawling. It was Mr. Rawling who did the talking. He read some regulation and then told me I was guilty of stealing time from the State by riding around and not working. I responded that I was doing exactly what my boss told me to do. Mr. Rawling told me that he didn't believe me. He also told me that they had checked the GPS on the truck I was using and that I had been parked for 45 minutes near the lake.

33.

Mr. Rawling then told me I had two options: (1) I could resign; or (2) I could challenge the termination for theft of time and also be ready to have criminal charges brought against me. He added that if I resigned, I would have the right to re-apply for a job with the state in three years.

34.

I know this is merely pretextual. A white man had been found to have parked his vehicle for eight hours several weeks earlier and was merely given a warning.

35.

My record with DOTD is a good one. I have never received an oral or written reprimand prior to this incident. I have never received any discipline of any kind. As far as the "theft of time" allegation, I did nothing that every other co-worker and Mr. Dennis Rushing himself hasn't

done too many times to count.  Most importantly,  I was doing exactly what I had been told to do by my boss, Dennis Rushing.

36.

I believe Dennis Rushing discriminated against me because I am African American and a female.  I believe that my termination was in retaliation for having reported  to his supervisor in March 2016  his discriminatory treatment of me based on my race and my gender.

**WHEREFORE**, plaintiff Crystal Anderson demands the following relief against the defendant State of Louisiana, Department of Transportation and Development:

1. Compensatory damages including back pay and front pay in a reasonable;

2. Punitive damages in a reasonable sum;

3. Reasonable attorney fees, together with costs and litigation expenses; and

4. For such other relief as the court may find just and proper under the circumstances.

    Respectfully Submitted,

    GILLEY & GILLEY
    820 Jordan Street, Suite 206
    Post Office Box 52011
    Shreveport, LA 71135-2011
    Telephone: (318) 226-4989
    Facsimile: (318) 226-4502
    Email: patriciadordangilley@gmail.com


    BY: /s/ Patricia A. Gilley
        PATRICIA A. GILLEY
        LA Bar Number 06215
        Attorney for Crystal Anderson

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| **CRYSTAL A. ANDERSON** | **CIVIL ACTION** |
| **VERSUS** | **JUDGE** |
| **STATE OF LOUISIANA, DEPT. OF TRANSPORTATION & DEVELOPMENT** | **MAGISTRATE JUDGE** |

## AFFIDAVIT OF VERIFICATION

**STATE OF LOUISIANA**

**PARISH OF CADDO**

    **BEFORE ME**, the undersigned Notary Public, duly commissioned and qualified within and for the State and Parish aforesaid, personally came and appeared Crystal Anderson, who, after being by me duly sworn, did depose and state:

    That she is plaintiff in the above and foregoing Complaint With Jury Trial Demand, that she has read the same and that all the allegations of fact contained therein are true and correct to the best of her information, knowledge and belief.

                                          /s/Crystal Anderson
                                          **CRYSTAL ANDERSON**

    **SWORN TO AND SUBSCRIBED** before me, Notary Public, on this the 9th day of December 2017.

                                          /s/Patricia A. Gilley
                                          **NOTARY PUBLIC**